SO ORDERED: September 28, 2018.



_____
James M. Carr
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| MARTINA AILEEN HOLMES, ) | Case No. 16-07639-JMC-7A |
| ) | |
| Debtor. ) | |
| _____) | |
| ) | |
| STATE OF INDIANA on the relation of the ) | |
| INDIANA DEPARTMENT OF ) | |
| WORKFORCE DEVELOPMENT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adversary Proceeding No. 17-50017 |
| ) | |
| MARTINA AILEEN HOLMES, ) | |
| ) | |
| Defendant. ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER came before the Court for a bench trial on June 11, 2018 (the "Trial").

Plaintiff State of Indiana on the relation of the Indiana Department of Workforce Development

("DWD") appeared by counsel Amanda K. Quick. Defendant Martina Aileen Holmes

("Holmes") appeared by counsel John J. Allman and Chris Baker. At the conclusion of the Trial, the Court took the matter under advisement.

The Court, having reviewed the evidence presented at the Trial, *Plaintiff's Pre-Trial Brief* filed by DWD on June 6, 2018 (Docket No. 32), and the other matters of record in this adversary proceeding; having weighed the credibility of the witnesses; having heard the presentations of counsel at the Trial; and being otherwise duly advised, now enters the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052.

## **Findings of Fact**

The Court makes the following findings of fact:

1. On October 3, 2016, Holmes filed a voluntary petition under chapter 7 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"),[1] in the United States Bankruptcy Court for the Southern District of Indiana, Indianapolis Division.

2. On January 12, 2017, DWD filed the *Complaint to Determine Dischargeability of Debt* (Docket No. 1) (the "Complaint"), wherein DWD alleges that Holmes owes a debt (the "Debt") to DWD that is nondischargeable under §§ 523(a)(2)(A) and (a)(7).

3. On April 24, 2017, Holmes received her general discharge.

4. Holmes worked at Riley Hospital for Children ("Riley") as a Patient Support Assistant for two years, approximately 2007 to 2009.

5. After she lost her job at Riley, Holmes applied for unemployment benefits. Because Holmes had never filed for unemployment benefits, she sought the help of her sister-in-law and her uncle.

---

[1] All statutory references herein are to the Bankruptcy Code unless otherwise noted.

6.      Each request for unemployment benefits was submitted by a weekly voucher (the "Voucher(s)") to DWD as part of an online process.  Vouchers under Holmes' name were submitted during the weeks ending August 8, 2009 through November 14, 2009 and November 28, 2009 through May 1, 2010 (the "Relevant Period").[2]  During the Relevant Period, Holmes was employed part-time at Marshalls of MA, Inc. ("Marshalls"), and Holmes first earned income from Marshalls during the week ending August 29, 2009.

7.      Holmes completed and submitted the first few Vouchers on her own (through the week ending August 29, 2009).  Thereafter, Holmes' sister-in-law completed and submitted to DWD the Vouchers for Holmes for the other weeks during the Relevant Period.  Holmes' sister-in-law was able to submit Vouchers because Holmes provided her username and password to both her sister-in-law and her uncle.  Holmes told her sister-in-law the approximate amount of Holmes' Marshalls paycheck each week.  Her sister-in-law completed and submitted Vouchers to DWD online.  Holmes testified that she relied upon her sister-in-law because her sister-in-law had prior experience filing requests for unemployment benefits and Holmes lacked experience in such filings.  Holmes and her son were living in her brother and sister-in-law's home during part of the Relevant Period.

8.      As part of the online process to submit Holmes' Vouchers, DWD asked the question "*Did you work?"*, referring to a week for which benefits were requested.  Holmes' sister-in-law replied "Yes" on ten Vouchers but underreported Holmes' earnings from Marshalls.  On sixteen Vouchers, Holmes' sister-in-law answered "No" to the question of "*Did you work*?" although Holmes was employed part-time by Marshalls during those weeks.  On the Voucher for

---

[2]    DWD did not determine that DWD overpaid benefits to Holmes with respect to the weeks ending August 8, 2009, August 15, 2009, August 22, 2009, October 3, 2009, January 9, 2010, January 16, 2010, February 20, 2010, February 27, 2010, March 6, 2010, April 10, 2010, and April 17, 2010.

the week ending August 29, 2009, Holmes answered "No" to the question of "*Did you work?*" even though she was employed part-time by Marshalls during that week. *See* Exs. 4 and 7.

9. Holmes did not realize that her requests for unemployment benefits were approved. Moreover, Holmes was unaware that DWD transmitted funds to or for her benefit as unemployment benefits in response to and in reliance upon the Vouchers. Based on her uncle's explanation of DWD's payment of unemployment benefits, Holmes assumed that if she requested and was granted any such benefit DWD would mail a check payable to her. However, the unemployment benefits paid by DWD were electronically deposited into Holmes' existing bank account (the "Account") accessible by a debit card that the State of Indiana had previously issued to Holmes to receive child support payments. There is no evidence that DWD informed Holmes that unemployment benefits would be deposited into the Account.[3] When Holmes became aware that there were additional deposits into the Account (in addition to regular periodic support payments), she believed the funds were attributable to non-regular support payments being made by or on behalf of her son's father. She believed that the source of these funds was her child's father's income tax refund. She did not suspect that the funds came from DWD as unemployment benefits. While living in her sister-in-law's home, Holmes gave her sister-in-law her state-issued debit card to allow the sister-in-law to draw funds from the Account in order to pay "rent" to the sister-in-law and other expenses incurred for the benefit of Holmes and her son. Holmes gave her sister-in-law the debit card, but Holmes on several occasions called the customer support number on the card to determine the balance in the Account.

10. DWD's investigation into Holmes' request for the payment of unemployment

---

[3] The payment of unemployment benefits via debit card rather than check is covered on page 19 of the Claimant Handbook (the "Handbook"). However, the Handbook does not appear to address the issue of benefits being deposited into an existing account for which a claimant already has a state-issued debit card. *See* Ex. 3, pp. 19-22.

benefits began as the result of a tip.  During the investigation, DWD concluded that Holmes' Vouchers failed to disclose material facts, including Holmes' employment by and pay received from Marshalls.  Those facts, if disclosed, would have made Holmes ineligible to receive the unemployment benefits or eligible to receive benefits in a reduced amount.  During the investigation, Holmes met with a representative of DWD who told her that her case was not appealable.  DWD issued two "Determinations of Eligibility" on June 16, 2010, which concluded Holmes knowingly failed to disclose or falsified material facts and notified Holmes of her right to appeal.  DWD's determinations became administratively final on June 28, 2010, after Holmes did not appeal (based on the statement by DWD's representative).  *See* Ex. 8.  The overpayments have accrued interest, and penalties have been applied.  Less any payments or offsets, the amount of the Debt DWD asserts Holmes owes is $10,191.40.  Ex. 1.

11.     Holmes' testimony regarding her conversation with the DWD representative is unrebutted.  DWD presented no evidence to counter Holmes' testimony that (1) she submitted only one of the Vouchers (for the week ending August 29, 2009) that resulted in an overpayment of benefits; (2) she was unaware of the content of Vouchers submitted by her sister-in-law; and (3) she did not intend to make any false representation to DWD or otherwise defraud DWD with respect to the submission of any Voucher.  Holmes testified that she did not intend to deceive the DWD with respect to any request for unemployment benefits.

12.     The Court finds that Holmes' testimony was credible and worthy of belief.

13.     As a general matter, DWD relies on answers given by claimants in weekly vouchers to determine eligibility.  DWD contends that a party applying for benefits is "required to read the Claimant Handbook," which was hyperlinked on the Voucher website.  Ex. 2.

Holmes did not read the Handbook. In response to and reliance on the Vouchers submitted, DWD paid unemployment benefits to Holmes.

14. In order to submit a weekly voucher to obtain unemployment benefits, the person submitting the voucher is exposed to a voucher certification screen that stated "I certify that I have reported any and all work, earnings and self-employment activity for this week … . I certify that all answers and information given in this application for benefits are true and accurate." Ex. 5. The Handbook states that an individual commits fraud "when you [k]nowingly fail to report any earnings received during your waiting period, benefit period or extended benefit period, or [h]ide or falsify any fact that would make you ineligible for benefits or reduce your benefit amount." Ex. 3, p. 2. The Handbook also advises that DWD "aggressively pursues any acts of fraud committed against the Unemployment Insurance Program." *Id.*

15. DWD asserts that if an applicant for unemployment benefits provides his or her password and username to a third party, the applicant remains culpable for any misrepresentation made by the third party in connection with a request for benefits on behalf of the applicant. DWD contends that those submitting vouchers agree that they have read the "Penalties for Falsification Warning" that states "If I give my password to another person and benefits are claimed, I will be held responsible." Ex. 2, p. 2.

## Conclusions of Law

1. Any finding of fact above will also be a conclusion of law, and any conclusion of law will also be a finding of fact to support the judgment of the Court.

2. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1334 and 157.

3. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

4. Venue is proper in this matter pursuant to 28 U.S.C. §§ 1408 and 1409.

5. Exceptions to discharge under § 523 "are to be [construed] strictly against a creditor and liberally in favor of the debtor." *Goldberg Sec., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992) (quoting *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985)). "The burden is on the objecting creditor to prove exceptions to discharge." *Id.* (citation omitted). The burden of proof required is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

## § 523(a)(2)(A)

6. Section 523(a) provides, in relevant part:

> A discharge under section 727 … of this title does not discharge an individual debtor from any debt –
>
> …
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>
> (A) false pretenses, a false representation, or actual fraud … .

7. The Seventh Circuit Court of Appeals has noted material differences among the three possible grounds for nondischargeability under § 523(a)(2)(A) and has formulated two different tests, one for both "false pretenses" and "false representation" and another for "actual fraud." *See Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 699-700 (Bankr. N.D. Ill. 2002) (citing *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000)).

8. To prevail on a nondischargeability claim under the "false pretenses" or "false representation" theories, a creditor must prove all of the following elements: "(1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied." *Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010).

9. "What constitutes 'false pretenses' in the context of § 523(a)(2)(A) has been defined as 'implied misrepresentations or conduct intended to create and foster a false impression.'" *Mem'l Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996) (quoting *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 959 (Bankr. N.D. Ill. 1995) (internal quotations omitted)). "False pretenses do not necessarily require overt misrepresentations. Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.* at 928 (citation omitted).

10. A "false representation" is an express misrepresentation that can be shown by the debtor's written statement, spoken statement or conduct. *Deady v. Hanson (In re Hanson),* 432 B.R. 758, 772 (Bankr. N.D. Ill. 2010) (citing *Bletnitsky v. Jairath (In re Jairath)*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001)). "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression." *Id.* (citing *Trizna & Lepri v. Malcolm (In re Malcolm),* 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)). "An intentional falsehood relied on under § 523(a)(2)(A) must concern a material fact." *Scarpello*, 272 B.R. at 700 (citing *Jairath*, 259 B.R. at 314).

11. Justifiable reliance is an intermediate level of reliance which is less stringent than "reasonable reliance" but more stringent than "reliance in fact." *See Field v. Mans*, 516 U.S. 59, 72-73, 116 S.Ct. 437, 445, 133 L.Ed.2d 351 (1995). Justifiable reliance requires only that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation" and imposes no duty on the creditor to investigate unless the falsity of the representation is readily

apparent. *Id.* at 71 (quotations omitted). Justifiable reliance is not measured from the objective person standard, but rather from the experiences and characteristics of the particular creditor. *Id.* (quotation omitted).

12. "Scienter, or intent to deceive, is … a required element under § 523(a)(2)(A) whether the claim is for a false representation, false pretenses, or actual fraud." *Gasunas v. Yotis (In re Yotis)*, 548 B.R. 485, 495 (Bankr. N.D. Ill. 2016) (citations omitted).

13. A debtor's intent to deceive for purposes of the false pretenses and false representation prongs on § 523(a)(2)(A) "is measured by a debtor's subjective intention at the time the representation was made." *Scarpello*, 272 B.R. at 700 (citing *Mercantile Bank v. Canovas*, 237 B.R. 423, 428 (Bankr. N.D. Ill. 1998)). "Because direct proof of fraudulent intent is often unavailable, fraudulent intent may be inferred from the surrounding circumstances." *Hanson*, 432 B.R. at 773 (internal citations omitted).

14. "[A]ctual fraud is broader than misrepresentation," *McClellan*, 217 F.3d at 893, in that neither a debtor's misrepresentation nor a creditor's reliance is necessary to prove nondischargeability for "actual fraud." *Scarpello*, 272 B.R. at 700 (citing *McClellan*, 217 F.3d at 894). "Actual fraud" is defined as "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another" which includes "all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan*, 217 F.3d at 893 (internal citations omitted). *See also Husky Int'l Elec., Inc. v. Ritz*, -- U.S. --, 136 S.Ct. 1581, 1586, 194 L.Ed.2d 655 (2016) ("The word 'actual' has a simple meaning in the context of common-law fraud: It denotes any fraud that 'involv[es] moral turpitude or intentional wrong.' ") (quotation omitted). In such cases, a creditor must prove "(1) a fraud occurred; (2) the debtor intended to defraud the creditor; and (3) the fraud created the debt that is

the subject of the discharge dispute." *Hanson*, 432 B.R. at 772 (citing *McClellan*, 217 F.3d at 894).

15. "[T]he focus of an 'actual fraud' claim is on the defendant's state of mind at the time of his purportedly fraudulent conduct." *Merritt v. Wiszniewski (In re Wiszniewski)*, 2010 WL 3488960 at *5 (Bankr. N.D. Ill. 2010) (citation omitted).

16. Holmes admitted she worked for Marshalls during the Relevant Period. DWD reasonably relied on Holmes' representations on the Vouchers in awarding Holmes' unemployment benefits. Therefore, the central question, under any of the three prongs of § 523(a)(2)(A), is whether Holmes "intended" to deceive DWD.

17. The Court must determine Holmes' state of mind during the Relevant Period. It is clear to the Court that Holmes was confused by the voucher process and sought the help of persons she believed were more knowledgeable (her uncle and sister-in-law). While Holmes admits that she submitted the Voucher for the week ending August 29, 2009, Holmes testified that her sister-in-law completed and submitted the other Vouchers. The burden of proof for determining fraudulent intent is on DWD, and based on the evidence presented, DWD did not meet its burden of proof. The Court's review of all the evidence does not support an inference of fraudulent intent. (*Hanson*, 432 B.R. at 773).

18. While DWD can prove that it provided unemployment benefits to or for the benefit of Holmes while she was employed, the credible evidence indicates that Holmes was unaware that DWD paid the benefits to her by depositing funds into her Account. Holmes believed that any unemployment benefits that DWD might pay to her would be received via a check mailed by DWD to her. Holmes did not realize that DWD would pay unemployment benefits by making electronic deposits into her Account. The unemployment funds were

deposited into the same Account into which child support funds were deposited.  Prior to the deposit of unemployment benefits into the Account, Holmes was aware that substantial sums had been deposited into that Account as child support, after her son's father had received a tax refund.  The fact that both regular and irregular child support payments were deposited into the Account caused Holmes to fail to realize that she received unemployment benefits as deposits to the Account.

19. DWD contends that Holmes' sister-in-law was Holmes' agent for purposes of making fraudulent claims and that the sister-in-law's fraud should be attributed to Holmes for purposes of §523(a)(2)(A).  However, the Seventh Circuit Court of Appeals held in *Sullivan v. Glenn* (*In re Glenn*), 782 F.3d 378 (7th Cir. 2015), cert. denied, 577 U.S. (2015), that a principal is not charged with an agent's misrepresentations for nondischargeability purposes unless the principal "knew or should have known of the agent's fraud" or "was recklessly indifferent to the acts of his agent."  *Id.* at 382 (citing *In re Walker*, 726 F.2d 452, 454 (8th Cir. 1984)).

20. DWD did not present evidence that Holmes knew of her sister-in-law's misrepresentations to DWD.  Holmes may have been foolish in her reliance upon her sister-in-law to correctly complete and submit Vouchers, but no evidence was presented that Holmes knew or should have known that her sister-in-law incorrectly entered information in the Vouchers concerning Holmes' employment by or payment from Marshalls.  The Court concludes that Holmes was not recklessly indifferent to the actions of her sister-in-law.  She told her sister-in-law the approximate amount of her Marshall's paycheck each week and assumed that her sister-in-law would report the information correctly, should she submit a Voucher.

21. The Court concludes that Holmes was not acting with fraudulent intent.

22. DWD has failed to satisfy its burden to prove that the Debt should be excepted

from discharge pursuant to § 523(a)(2)(A).  Therefore, the Court concludes that the non-penalty portion of the Debt is not excepted from discharge pursuant to § 523 (a)(2)(A).

*§ 523(a)(7)*

23.     A debt is not dischargeable pursuant to § 523(a)(7) "to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss… ."

24.     There was no dispute or argument at Trial regarding DWD's claim that the penalties it imposed against Holmes pursuant to Ind. Code § 22-4-13-1.1(b) are excepted from discharge pursuant to § 523(a)(7).

25.     The Court notes that there is no intent element in determining whether a penalty is excepted from discharge pursuant to § 523(a)(7).  Therefore, the fact that the Debt contains penalties payable to and for the benefit of DWD, a governmental unit, which are not compensation for actual pecuniary loss is sufficient to satisfy § 523(a)(7).

26.     Therefore, the Court concludes that the penalty portion of the Debt is excepted from discharge pursuant to § 523(a)(7).

*Decision*

27.     The non-penalty portion of the Debt is not excepted from discharge pursuant to § 523(a)(2)(A).

28.     The penalty portion of the Debt is excepted from discharge pursuant to § 523(a)(7).

The Court will enter judgment consistent with these findings of fact and conclusions of law contemporaneously herewith.

# # #